UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                  :

LISA STASHAK,
                                  :

                Plaintiff,          :

                                  :             25-CV-3808 (JMF)

        -v-                 :

                                  :        OPINION AND ORDER

PHREESIA, INC.,
                                  :

              Defendant.       :

                                  :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

In this case, Plaintiff Lisa Stashak alleges that her former employer, Phreesia, Inc. ("Phreesia"), discriminated against her on the basis of age and failed to pay her commissions that she was owed. She brings claims under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*; and the New York Labor Law ("NYLL"), §§ 191-c, 193. Phreesia now moves, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, to dismiss Stashak's First Amended Complaint. For the reasons that follow, the motion is GRANTED as to Stashak's state-law claims and DENIED as to her federal claims.

## BACKGROUND

The following facts are, unless otherwise noted, taken from the First Amended Complaint (the "Complaint") and assumed to be true for purposes of this motion. *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).[1]

---

[1] Citing Phreesia's reliance on extrinsic documents, Stashak invites the Court to convert Phreesia's motion to dismiss into a motion for summary judgment. *See* ECF No. 17 ("Pl.'s

Stashak is fifty-eight years old and lives in Maryland.  *See* ECF No. 12 ("FAC"), ¶¶ 8, 23.  She began working for Phreesia, a health care technology company, in 2011.  *Id.* ¶¶ 1, 13.  Phreesia used to have a New York City address, but it now operates remotely.  *Id.* ¶ 9.[2]  Stashak, however, lived and worked remotely in Maryland throughout her employment with Phreesia.  *Id.* ¶¶ 8-9.  She visited New York City only about once per month — for meetings with clients, trade events, and quarterly meetings, among other things.  *Id.* ¶¶ 15, 17-21.

In 2018, Phreesia reorganized the company by terminating every employee on the life science sales team over the age of forty, with the exception of Stashak.  *Id.* ¶ 24.  Stashak was spared because she was "far and beyond" Phreesia's "most important employee"; she was "a very successful senior employee" who earned approximately $186,000,000 for Phreesia, allowing the company to go public sooner than expected.  *Id.* ¶¶ 1, 25-26.  Following the 2018 reorganization, however, Stashak alleges that she experienced "rampant" discrimination on the basis of age, including "harassing comments, the stripping of Plaintiff's work responsibilities," and exclusion from both company meetings and group chats.  *Id.* ¶¶ 1, 27, 83.

---

Mem."), at 8.  But "[c]onversion . . . is generally not appropriate unless the parties have had the opportunity to conduct appropriate discovery and submit additional supporting materials."  *LM Ins. Corp. v. James River Ins. Co.*, No. 22-CV-7472 (ER), 2023 WL 5509264, at *3 (S.D.N.Y. Aug. 25, 2023) (internal quotation marks omitted).  As that is not the case here, the Court declines Stashak's invitation.  Instead, the Court will not consider the extrinsic materials submitted by Phreesia, including Stashak's performance reviews and agreements between the parties.  These documents are either not referenced in the Complaint at all or not relied upon so heavily as to be "integral."  *See, e.g.*, *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (noting that "[m]erely mentioning a document in the complaint will not satisfy" the standard for considering a document integral to a complaint); *Williams v. Time Warner Inc.*, 440 F. App'x 7, 9 (2d Cir. 2011) (summary order) (noting that "[a] mere passing reference . . . to a document outside of the complaint" does not suffice for incorporation by reference).

[2]    The Complaint is silent with respect to when Phreesia shifted to remote operations. Phreesia cites regulatory filings indicating that it was in December 2020.  *See* ECF No. 14 ("Def.'s Mem."), at 4 n.2.

Stashak alleges that, beginning with a "radical[] change[]" to her "compensation structure" in 2018, Phreesia adversely changed the conditions of her employment. *Id.* ¶¶ 35-36. From 2018 to 2024, for example, Stashak's commission compensation was reduced from 6% to 1.75%. *Id.* ¶ 35, 40. In December 2022, her title was "suddenly changed" from "Sales Director" to "Strategic Advisor," which resulted in a reduced commission structure. *Id.* ¶¶ 45-46. The change meant that Stashak "no longer had a leadership role" and was no longer "included in leadership meetings for Director level and up." *Id.* ¶ 52-53. Stashak alleges that this demotion was designed "solely to harm" her and "force her to end her employment." *Id.* ¶¶ 50-53.

When Stashak was demoted in December 2022, Danielle Lynch, a younger employee, effectively became her supervisor. *Id.* ¶¶ 30-31, 47. In that capacity, Lynch attempted "to terminate [Stashak] or to otherwise force her to end her employment" because of her age. *Id.* ¶ 84. Lynch told Stashak's coworker that she "was trying to push out [Stashak] because 'she is getting too old, and we pay her too much "effing" money'" and "confirmed that [Phreesia] was trying, over many years, to make [Stashak]'s employment less attractive so that she would leave on her own." *Id.* ¶¶ 34, 41. In December 2023, Phreesia gave Stashak an unfounded negative performance review despite the fact that she held "the largest book of business"; by contrast, all of the younger employees were "told they were . . . exceeding expectations." *Id.* ¶¶ 54-57. In February 2024, Stashak was blindsided when she was left off all client accounts and told "that her role would be changing." *Id.* ¶¶ 58-61. In July 2024, Lynch excluded Stashak from an in-person quarterly meeting in New York City. *Id.* ¶¶ 69-72. Although Stashak had previously attended these meetings, Lynch told her that the company's Directors had agreed that it was not "necessary for her to be there" in person. *Id.* ¶¶ 66-71 (internal quotation marks omitted).

3

Stashak later learned that Lynch had lied to her and that no Director had in fact agreed that she was not needed.  *Id.* ¶ 72.

Stashak also alleges that, during her time at Phreesia, she experienced ageist conduct throughout the workplace.  Employees in their twenties and thirties "constantly made negative, harassing, and offensive jokes or remarks about older people in the working world."  *Id*. ¶ 33.  Stashak alleges, for example, that one of Lynch's direct reports "vehemently complain[ed] about '50 something year old middle aged women'" on a conference call, eliciting laughter from others.  *Id.* ¶¶ 78-79.  Additionally, "employees would routinely make disparaging comments" about older employees of the company's clients.  *Id.* ¶ 82.  This offensive discourse "was not uncommon as younger employees for Defendant laughed at, mocked, or otherwise belittled older employees for major pharmaceutical companies."  *Id.* ¶ 81.  Stashak alleges, "[u]pon information and belief," that she was also excluded from a company group chat called the "wolfpack," which included only employees under forty years old.  *Id.* ¶¶ 30-31.  In the group chat, the employees "routinely complain[ed] about older generations and about [Stashak]" specifically.  *Id*. ¶ 32.

As a result of these various encounters, and the emotional distress that they allegedly caused, Stashak informed Phreesia in 2024 that "she would seek alternative employment."  *Id.* ¶ 86; *see also id.* ¶¶ 60, 93.  In July 2024, Phreesia offered Stashak a separation and settlement agreement but provided her only twenty-four hours to respond.  *Id.* ¶ 85.  The proposed agreement included commission and stock vesting through April 2025 and salary for three months.  *Id.* ¶ 89.  When Stashak did not sign within twenty-four hours, Phreesia "removed the three months of salary and then revoked commission two weeks after [Stashak's] departure from Phreesia."  *Id.* ¶ 90.  Stashak ultimately ended her employment at Phreesia in August 2024.  *Id.* ¶ 93.  Upon learning of her exit, Phreesia's "CEO and Senior Leadership directly thanked

Plaintiff for all of her hard work and offered to pay her commission and vest stock through April 2025." *Id.* ¶¶ 93-95.  After the employment relationship ended, however, Phreesia failed to fully compensate Stashak for her work.  Stashak was owed commission from deals closed through January 2024.  *Id.* ¶¶ 97-98. Furthermore, although Stashak "was to be paid a portion of her owed commission in October 2024, January 2025, and April 2025. . . . after her employment ended . . . Plaintiff was not paid these commissions."  *Id.*  ¶¶ 101-02.

**LEGAL STANDARDS**

Phreesia moves to dismiss principally pursuant to Rule 12(b)(6).[3]  In evaluating that motion, the Court must accept all facts set forth in the Complaint as true and draw all reasonable inferences in Stashak's favor.  *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  A claim will survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the

---

[3]    In moving to dismiss Stashak's state-law claims on the ground that the state laws at issue do not apply beyond New York, Phreesia also relies on Rule 12(b)(1).  Some state courts have indeed treated extraterritoriality as a subject-matter jurisdictional issue under state law. *See, e.g.*, *Pakniat v. Moor*, 145 N.Y.S.3d 30 (1st Dep't 2021); *Jarusauskaite v. Almond Diamonds, Ltd.*, 152 N.Y.S.3d 579 (1st Dep't 2021).  Whether that makes it subject-matter jurisdictional for purposes of a federal court in a federal case is a more complicated question. *Compare, e.g.*, *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 253-54 (2010) (holding that subject-matter jurisdiction "refers to a tribunal's power to hear case," not whether the "allegations the plaintiff makes entitle him to relief," and that the extraterritoriality of a federal law is a merits, not a jurisdictional, issue (internal quotation marks omitted)), *and Grand Bahama Petroleum Co. v. Asiatic Petroleum Corp.*, 550 F.2d 1320, 1325 (2d Cir. 1977) ("In determining its own jurisdiction, a District Court of the United States must look to the sources of its power and not to the acts of states which have no power to enlarge or to contract the federal jurisdiction." (internal quotation marks omitted)), *with Moodie v. Fed. Reserve Bank of N.Y.*, 58 F.3d 879, 884 (2d Cir. 1995) ("[A] state law depriving its courts of jurisdiction over a state law claim also operates to divest a federal court of jurisdiction to decide the claim."), *and Fox v. Ritz-Carlton Hotel Co.*, 977 F.3d 1039, 1050 (11th Cir. 2020) ("[A] federal court does not have diversity subject-matter jurisdiction over a claim for which a state court would not have jurisdiction.").  In any event, the Court's analysis and conclusions would be the same under either Rule.

5

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570. Where, as here, a plaintiff brings claims of employment discrimination, however, "[t]he facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86-87 (2d Cir. 2015).

## DISCUSSION

Stashak brings hostile work environment claims under the ADEA, the NYSHRL, and the NYCHRL, *see* FAC ¶¶ 103-13; constructive discharge claims under the same three statutes, *id.* ¶¶ 114-25; an unlawful demotion claim under the NYCHRL, *id.* ¶¶ 126-35;[4] and a claim for failure to pay commissions under the NYLL, *id.* ¶¶ 136-40. Phreesia moves to dismiss all claims. *See* ECF No. 14 ("Def.'s Mem."), at 1. The Court will first address Stashak's federal claims under the ADEA and then turn to her claims brought under New York law.

---

[4] For reasons that are not clear, Stashak does not bring an unlawful demotion claim under the ADEA or the NYSHRL. *See generally* FAC ¶¶ 103-140.

## A.  Federal Claims

Stashak brings two claims under the ADEA — a hostile work environment claim and a constructive discharge claim.  FAC ¶¶ 103-13; 114-25.  Relying on *Prichard v. Long Island University*, No. 23-CV-9269, 2025 WL 2163390 (E.D.N.Y. Jul. 30, 2025), Phreesia argues, as a threshold matter, that these claims should be dismissed because the Equal Employment Opportunity Commission ("EEOC") issued a right-to-sue letter less than 180 days after Stashak filed her charge.  *See* Def.'s Mem. 13.  In *Prichard*, the court held that Title VII prohibits the EEOC from issuing a right-to-sue letter "for a charge it has not dismissed less than 180 days after the charge is filed"— and that an EEOC regulation, 29 C.F.R. § 1601.28(a)(2), authorizing that practice is invalid.  *See* 2025 WL 2163390, at *2-3.  But even if that holding is correct, *contra, e.g.*, *Germain v. Nielsen Consumer LLC*, 655 F. Supp. 3d 164, 178-79 (S.D.N.Y. 2023) (collecting cases which have held that the EEOC regulation does not contradict Title VII), it would not apply here, as the ADEA incorporates the procedural provisions of "the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, not Title VII," *Moorning-Brown v. Bear, Stearns & Co.*, No. 99-CV-4130 (JSR) (HBP), 2000 WL 16935, at *11 (S.D.N.Y. Jan. 10, 2000).  In contrast to Title VII, "there is no provision in the ADEA that requires a claimant to receive [a right-to-sue] letter before commencing a court action under the ADEA." *Francis v. Elmsford Sch. Dist.*, 442 F.3d 123, 127 (2d Cir. 2006); *see also Hodge v. N.Y. Coll. of Podiatric Med.*, 157 F.3d 164, 168 (2d Cir. 1998) ("The ADEA plaintiff can sue in court even if the EEOC has not yet completed its investigation or attempts at conciliation.").  Because a "right-to-sue" letter is

not required in ADEA cases at all, *see, e.g.*, *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 214-15 (2d Cir. 2006), Phreesia's reliance on *Prichard* is plainly misplaced.[5]

With that, the Court will address each of Stashak's ADEA claims in turn.

### 1. Hostile Work Environment Claim

To bring a hostile work environment claim under the ADEA, a plaintiff "must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment.'" *Francis v. Elmsford Sch. Dist.*, 263 F. App'x 175, 177 (2d Cir. 2008) (summary order) (quoting *Kassner v. 2nd Ave. Delicatessen Inc.*, 469 F.3d 229, 240 (2d Cir. 2007)). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn,* 795 F.3d at 321 (internal quotation marks omitted); *see Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) ("The analysis of the hostile working environment theory of discrimination is the same under the ADEA as it is under Title VII."). A hostile work environment claim can be based on "a single incident [that] was extraordinarily severe, or . . . a series of incidents [that] were sufficiently continuous and concerted to have altered the conditions of [the plaintiff's] working environment." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks

---

[5]    Phreesia also argues that Stashak's hostile work environment claim should be dismissed as time barred. Def.'s Mem. 12-13, 15. That argument is easily rejected, however, because "a charge alleging a hostile work environment claim [is not] time barred so long as all acts which constitute the claim are part of the same unlawful employment practice *and at least one act falls within the time period.*" *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) (cleaned up) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002)); *Bernstein v. N.Y.C. Dep't of Educ.*, No. 21-2670, 2022 WL 1739609, at *1 n.2 (2d Cir. May 31, 2022) (summary order).

omitted).  "Minor incidents do not merit relief."  *Francis*, 263 F. App'x at 177 (quoting *Kassner*, 469 F.3d at 240); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (observing that "simple teasing, offhand comments, and isolated incidents" do not suffice (cleaned up)).  "In determining whether a plaintiff meets the 'severe or pervasive' standard, courts must consider the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with a plaintiff's job performance."  *Harewood v. N.Y.C. Dep't of Educ.*, No. 18-CV-05487 (KPF) (KHP), 2019 WL 3042486, at *4 (S.D.N.Y. May 8, 2019) (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003)).

Measured against these standards, Stashak's allegations are sufficient to support a claim. First, she alleges that her supervisor, Lynch, sought to push her out of Phreesia because of her age.  *See, e.g.*, FAC ¶ 84.  In fact, Lynch allegedly told a coworker that she "was trying to push out [Stashak] because 'she is getting too old, and we pay her too much "effing" money.'"  *Id.* ¶ 34; *see also Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) ("[T]he fact that a plaintiff learns second-hand of a [] derogatory comment . . . by a fellow employee or supervisor also can impact the work environment[.]").  The Complaint further alleges that Lynch gave Stashak negative performance reviews, excluded her from quarterly meetings (and lied to her about doing so), and participated in limiting Stashak's compensation, all because of her age. *See, e.g.*, FAC ¶¶ 59, 69-72.  Second, Stashak alleges that ageist conduct was pervasive in the workplace.  Younger employees, the Complaint alleges, "constantly made negative, harassing, and offensive jokes or remarks about older people in the working world."  *Id.* ¶ 32; *see also id.* ¶ 78-79 (alleging that one of Lynch's direct reports "vehemently complain[ed] about '50 something year old middle aged women'" on a conference call).  And employees under forty

9

years old excluded Stashak from a company group chat called the "wolfpack," in which they "routinely complain[ed] about older generations and about" Stashak specifically. *Id.* ¶¶ 30-32. And finally, Stashak also alleges that her supervisors took adverse actions against her on the basis of age, thereby contributing to a hostile environment. *See, e.g.*, *King v. N.Y.C. Dep't of Educ.,* No. 23-CV-7622 (ER), 2025 WL 2083831, at *9 (S.D.N.Y. July 24, 2025) (considering "whether the employee suffered an adverse employment action" in assessing a hostile work environment claim); *accord Zoulas v. N.Y.C. Dep't of Educ.*, 400 F. Supp. 3d 25, 60 (S.D.N.Y. 2019). For instance, Stashak alleges that she was formally removed from client accounts, leading to "a significant loss of prestige that was incredibly distressing and embarrassing." *Id.* ¶ 60. And from 2018 (when all other older employees were terminated) to 2024, Phreesia decreased Stashak's commissions from 6% to 1.75%. *Id.* ¶¶ 35, 40. "No younger employees were forced to accept lower commissions, and all older employees had already been terminated." *Id.* ¶ 36.

To be sure, some of Stashak's allegations (for example, that employees "constantly" made negative comments about older people and that such belittling was "common") border on conclusory. FAC ¶¶ 30-32, 78-79, 81. But taken together and construed in the light most favorable to Stashak, her allegations state a plausible claim. Indeed, the allegations are as strong as, if not stronger than, allegations that other courts have found sufficient at the motion-to-dismiss stage. *See, e.g.*, *Rosen v. N.Y.C. Dep't of Educ.*, No. 18-CV-6670 (AT), 2019 WL 4039958, at *8 (S.D.N.Y. Aug. 27, 2019) (sustaining a claim where the plaintiff was highly experienced but her duties were transferred to younger employees and other older teachers experienced similar discrimination); *Zoulas*, 400 F. Supp. 3d at 60 (finding comments that age affected plaintiff's work performance coupled with other discriminatory behavior like changing

10

her classroom but not the classroom of younger employees, denying her professional development opportunities, and having other teachers harass her, sufficient to plausibly allege a hostile work environment); *Verne v. N.Y.C. Dep't of Educ.*, No. 21-CV-5427 (JPC), 2022 WL 4626533, at *12 (S.D.N.Y. Sept. 30, 2022) (same when the plaintiff "was negatively reviewed on the basis of her age, repeatedly improperly disciplined on the basis of her age, and subject to age-based insults"); *see also, e.g.*, *Terry*, 336 F.3d at 148 ("While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high[.]").

In short, Stashak's allegations go beyond "episodic instances of mere offensive utterances" and support an inference that Phreesia "alter[ed] the conditions of [her] work environment" because of her age. *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 455 (S.D.N.Y. 2012) (cleaned up). The motion to dismiss Stashak's hostile work environment claim under the ADEA must be and is therefore DENIED.

### 2. Constructive Discharge Claim

For similar reasons, the Court concludes that Stashak also states a plausible claim of constructive discharge under the ADEA. Constructive discharge "occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Serrichio v. Wachovia Sec., LLC*, 658 F.3d 169, 185 (2d Cir. 2011). A plaintiff must demonstrate both "specific intent to prompt" a resignation and that an objectively reasonable person in plaintiff's position would find her "work conditions so intolerable as to compel resignation." *Petrosino v. Bell Atl.*, 385 F.3d 210, 229-30 (2d Cir. 2004). There is "a distinction between constructive discharge claims that are based on tangible employment actions taken by an employer and constructive discharge claims that 'stem

11

from, and can be regarded as aggravated cases of . . . hostile work environment.'"  *Brandenburg v. Greek Orthodox Archdiocese of N. Am.*, No. 20-CV-3809 (JMF), 2021 WL 2206486, at *5 (S.D.N.Y. June 1, 2021) (cleaned up) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 146 (2004)).  A constructive discharge may be shown "if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions."  *Suders*, 542 U.S. at 134.

Here, Stashak bases her constructive discharge claim not only on the allegations underlying her hostile work environment claim, discussed above, but also on official actions taken by Phreesia.  In cases involving official actions, courts have consistently held that "[a] demotion with a reduction in pay . . . , when accompanied by evidence of malicious intent, can establish constructive discharge."  *Dean v. Westchester Cnty. Dist. Att'y's Off.,* 119 F. Supp. 2d 424, 431 (S.D.N.Y. 2000); *see also Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 310 (N.D.N.Y. 2013) (noting that "[a] demotion, particularly one that is accompanied by a significant loss of salary, prestige or responsibilities, or is otherwise 'humiliating,' may also, on its own, give rise to a constructive discharge claim" (collecting cases)); *Bright-Asante v. Saks & Co., Inc.*, 242 F. Supp. 3d 229, 243 (S.D.N.Y. 2017) ("[A] drastic change in employment status or responsibilities can amount to a constructive discharge."), *aff'd*, 855 F. App'x 40 (2d Cir. 2021) (summary order).  Stashak alleges precisely that here: that her title was changed; that her compensation structure was significantly altered, resulting in reduced commissions; and that she was removed from client accounts and excluded from a quarterly meeting, all because of her age.

*See* FAC ¶¶ 35-40, 45-46, 58, 67-72.  Accordingly, the motion to dismiss Stashak's constructive

discharge claim under the ADEA must be and is also DENIED.[6]

## B.  State-Law Claims

That leaves Stashak's claims under New York State law, namely the NYSHRL, the

NYCHRL, and the NYLL.  To bring a viable claim under the NYSHRL and NYCHRL, a

plaintiff who resides outside of New York, as Stashak does (and indisputably did throughout the

relevant time period), must adequately allege that the "impact" of the underlying controversy

was felt in New York.  *See Hoffman v. Parade Publications*, 15 N.Y.3d 285, 290-91 (2010); *see,*

*e.g.*, *Syeed v. Bloomberg L.P.*, 41 N.Y.3d 446, 451 (2024); *Chau v. Donovan*, 357 F. Supp. 3d

276, 283 (S.D.N.Y. 2019) ("In order for a nonresident to invoke the protections of the NYSHRL

and NYCHRL, she must show that the discriminatory act had an impact within the boundaries of

the State and the City, respectively." (internal quotation marks omitted)).  The NYLL is even

more limited in its application: It "does not apply extraterritorially to work performed outside of

New York," full stop.  *Smith v. Vera Inst. of Just., Inc.*, No. 21-CV-6430 (DG) (CLP), 2023 WL

11879682, at *15 (E.D.N.Y. Aug. 11, 2023); *accord Dittes v. ChargeAfter USA, Inc.*, No. 24-

CV-746 (RA), 2025 WL 1984273, at *4 (S.D.N.Y. July 17, 2025).  Thus, "[t]he crucial issue"

for purposes of an NYLL claim "is where the employee [was] 'laboring.'"  *O'Neill v. Mermaid*

*Touring Inc.,* 968 F. Supp. 2d 572, 579 (S.D.N.Y. 2013).

In light of these requirements, Stashak's state-law claims fail.  First, for purposes of the

NYSHRL and NYCHRL, her personal connections to New York are merely "tangential."

*Shaughnessy v. Scotiabank*, No. 22-CV-10871 (LAP), 2024 WL 1350083, at *7 (S.D.N.Y. Mar.

---

[6]    In arguing otherwise, Phreesia alleges that Stashak's employment was due to end on
September 30, 2024, "negating her constructive discharge claim."  ECF No. 18, at 1; *see also id.*
at 7-8.  But that allegation appears nowhere in Stashak's Complaint.

29, 2024); *see Fried v. LVI Servs., Inc.*, 500 F. App'x 39, 42 (2d Cir. 2012) (summary order).

Stashak "was and is a resident of Maryland" and operated predominantly "remotely." FAC ¶¶ 8-9. And nowhere does the Complaint allege that she experienced discrimination *in* New York. The mere fact that she "appeared in New York City" for occasional meetings and "complete[d] work" in New York "multiple times per quarter," FAC ¶¶ 18-21, without more, does not suffice. *See, e.g.*, *Vangas v. Montefiore Med. Ctr.,* 823 F.3d 174, 182-83 (2d Cir. 2016) (dismissing a NYCHRL claim where the patients with whom the plaintiff communicated were based in New York City, but the plaintiff worked in, was supervised, and was terminated in Yonkers); *Fried*, 500 F. App'x at 42 (affirming dismissal of a NYCHRL claim where the plaintiff lived and worked in Connecticut but attended meetings and communicated frequently with colleagues in New York City and the decision to terminate him was made in the City); *Hoffman*, 15 N.Y.3d at 288, 290-91 (dismissing a nonresident plaintiff's NYCHRL claims where the plaintiff attended quarterly meetings in New York City and where the decision to terminate him was made in the City); *Meilus v. Rest. Opportunities Ctr. United, Inc.*, No. 21-CV-2554, 2021 WL 4868557, at *10-11 (S.D.N.Y. Oct. 15, 2021) (dismissing a NYSHRL claim even though the plaintiff had to "travel regularly to New York for staff meetings and planned events, for her assigned work on the National One Fair Wage Work program, and for routine meetings with [her supervisor]"); *Pedroza v. Ralph Lauren Corp.*, No. 19-CV-8639 (ER), 2020 WL 4273988, at *3-5 (S.D.N.Y. July 24, 2020) (dismissing NYSHRL and NYCHRL claims where the nonresident plaintiff had "regular contact with . . . personnel in New York City" and traveled to New York City "twelve times in the last six months of her employment").

Contrary to Stashak's assertions, *see* ECF No. 17 ("Pl.'s Mem."), at 9-10, it is immaterial that her employment contract with Phreesia provides that it "will be deemed to be made and

entered into in the State of New York, and will in all respects be interpreted, enforced and governed under the laws of the State of New York." ECF No. 15-5, at 15. First, courts applying New York law have consistently held that language in a contract that the "agreement itself" is to be governed by a particular law is too narrow to cover noncontractual claims such as those here. *See, e.g.*, *Williams v. Deutsche Bank Sec., Inc.*, No. 04-CV-07588 (GEL), 2005 WL 1414435, at *5 (S.D.N.Y. June 13, 2005); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, No. 15-CV-211 (LGS) (SDA), 2020 WL 1442915, at *18 (S.D.N.Y. Jan. 27, 2020), *report and recommendation adopted*, No. 15-CV-211 (LGS), 2020 WL 1435645 (S.D.N.Y. Mar. 24, 2020). Second and in any event, courts analyzing whether a nonresident plaintiff is entitled to the protections of the NYSHRL and NYCHRL have consistently held that such choice-of-law provisions do not support a claim. *See, e.g.*, *Smith*, 2023 WL 11879682, at *16 ("Courts that have considered a choice-of-law provision when analyzing whether a nonresident plaintiff is entitled to the protections of the NYSHRL and NYCHRL have continued to analyze the question based on the application of the impact analysis."); *Pedroza*, 2020 WL 4273988, at *3, 5 (rejecting the plaintiff's argument that she could demonstrate impact in New York based on the defendant's selection of New York "as its choice-of-law in its severance agreement" because she "provide[d] no case law to suggest that these facts are sufficient to establish an impact in New York during her tenure with [defendant], or in connection with her termination"); *Trotter v. Nat'l Football League*, 737 F. Supp. 3d 172, 194 (S.D.N.Y. 2024) ("Plaintiff cites no case finding the impact requirement was satisfied by a choice-of-law provision, whereas defendants identify several cases that have found similar choice-of-law provisions in a severance agreement and a non-solicitation agreement to be insufficient to satisfy the impact test.").

Stashak's NYLL claim is even more attenuated because it concerns commissions owed pursuant to an agreement governing her departure from the company and the post-employment period — during which time she does not allege that she ever worked or resided in New York. In fact, the Complaint explicitly alleges that negotiations over what appears to have become her separation agreement were by "email" and "virtual[]." FAC ¶ 87. Courts regularly dismiss NYLL claims in similar circumstances. *See, e.g.*, *Dittes*, 2025 WL 1984273, at *2, 4 (dismissing a NYLL claim where the plaintiff lived in Oklahoma and traveled to New York only occasionally); *Smith*, 2023 WL 11879682, at *1, *16 (recommending dismissal of a NYLL retaliation claim premised on conduct "that occurred" during months the plaintiff resided in Maryland and "there are no allegations . . . placing plaintiff in New York during those months"). Because Stashak's claims under NYLL are "premised almost exclusively on work performed outside of this State, [s]he has failed to state a claim under that statute." *Kingston v. Int'l Bus. Machs. Corp.*, 135 N.Y.S.3d 9, 10 (1st Dep't 2020).

In short, Stashak's state-law claims must be and are DISMISSED.

### CONCLUSION

For the foregoing reasons, Phreesia's motion to dismiss is GRANTED with respect to Stashak's state-law claims and DENIED with respect to her federal claims. Further, the Court declines to grant leave to amend as to the state-law claims because the problems with them are substantive. *See, e.g.*, *Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (collecting cases). Moreover, Stashak does not seek leave to amend or state that she is in possession of facts that would cure the problems with those claims. *See, e.g.*, *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014); *accord TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505-06 (2d Cir. 2014). On top of all

16

that, the Court granted Stashak leave to amend in response to Phreesia's motion to dismiss and explicitly warned that it would "not be given any further opportunity to amend the complaint to address issues raised by the motion to dismiss."  ECF No. 11; *see, e.g.*, *Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 415 (S.D.N.Y. 2013).

Unless and until the Court orders otherwise, Phreesia shall answer the remaining claims within **three weeks of the date of this Opinion and Order**.  *See* FED. R. CIV. P. 12(a)(4)(A).  In addition, the initial pretrial conference, previously adjourned, is hereby reinstated and RESCHEDULED for **February 25, 2026**, at **9:00 a.m.**  To access the conference, counsel should call the Court's dedicated conference call line at (855) 244-8681 and use access code 2303 019 3884, followed by the pound (#) key.  When prompted for an attendee ID number, press the pound (#) key again.  The parties are reminded to follow the procedures for telephone conferences described in the Court's Individual Rules and Practices for Civil Cases, which are available at https://nysd.uscourts.gov/hon-jesse-m-furman, including Rule 3(B)(i), which requires the parties, no later than twenty-four hours before the conference, to send a joint email to the Court with the names and honorifics (e.g., Mr., Ms., Dr., etc.) of counsel who may speak during the conference and the telephone numbers from which counsel expect to join the call. The parties are reminded that, no later than the **Thursday before the conference**, they must submit a joint status letter and proposed Case Management Plan.  *See* ECF No. 3.

The Clerk of Court is directed to terminate ECF No. 13.

SO ORDERED.

Dated: January 30, 2026
   New York, New York

_____
                    JESSE M. FURMAN
                    United States District Judge